*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2015-283

NOVEMBER TERM, 2015

| | |
|---|---|
| In re L.D., Juvenile | APPEALED FROM:<br><br>Superior Court, Chittenden Unit,<br>Family Division<br><br>DOCKET NO. 321-11-13 Cnjv<br><br>Trial Judge: Thomas J. Devine |

In the above-entitled cause, the Clerk will enter:

Mother appeals from the termination of her parental rights in L.D., born in November 2013. Father voluntarily relinquished his rights. We affirm.

Mother has significant mental health issues. She has been diagnosed with factitious disorder, a condition where a person acts as if they have an illness by feigning or exaggerating symptoms of an illness. Mother claims to be blind and deaf, for example, but numerous treatment providers have observed behavior that belies these claims. Mother has engaged in residential psychiatric treatment, most recently when she was eight months pregnant with L.D. She exhibited concerning behavior during this time. Mother also has cerebral palsy and she is a paraplegic. Mother needs assistance getting in and out of bed, using the bathroom, showering, and maintaining personal hygiene.

Pursuant to a request by the Department for Children and Families (DCF), L.D. was taken into emergency custody at birth based on mother's mental health issues and her inability to care for herself. In November 2013, mother stipulated that L.D. was a child in need of care or supervision due to mother's significant physical and mental health issues. The case plan required, among other things, that mother maintain stable housing; engage in a psychological assessment and follow treatment recommendations; engage in a parenting assessment; sign releases to allow DCF to communicate with service providers; and engage in supervised visitation.

In October 2014, DCF moved to terminate mother's rights. Shortly thereafter, mother married a man who works as her personal care attendant and she sought to include him in her visits with L.D. DCF determined that it was not in L.D.'s best interests to introduce another person during visits given the difficulties that L.D. was already experiencing during the transition to visits. Mother then asked the court to include her new husband in visitation with L.D., and the court denied her request. It noted that L.D. was very young, and found that visitation provided a focused opportunity for mother and L.D. to spend time together. Having L.D. develop a bond with mother's new husband was a secondary concern at this stage.

Following a hearing in June 2015, the court terminated mother's rights. It found that mother made no substantial progress in meeting L.D.'s needs or responding to his cues despite a year and a half of Easter Seals services. It found little to no evidence that L.D. had bonded with mother. Mother was dismissive of attempts to help her. For example, mother notified DCF of her plan to have a certain woman move in with her to provide caregiving support. DCF learned that this person had a criminal history as well as a history with DCF. Mother nonetheless insisted on this woman providing care. Within a short time, mother reported that the caregiver stole things from her and was abusive. After this caregiver moved out, mother indicated that she was going to remarry her ex-husband, a man whom DCF learned had his parental rights terminated in another child. Not long thereafter, mother indicated that she had found a new live-in caretaker, a Mr. Thurston. Mr. Thurston had been working as a supermarket clerk for fifteen years, but became a certified adult care provider for mother after a chance encounter with her at a bus station. Mr. Thurston moved in with mother in November 2014, and shortly thereafter, he and mother married. The court noted that Mr. Thurston had no training and little to no experience in caring for children. He had never met L.D.

Turning to L.D., the court found that he had been in the same foster home since he was three weeks old. The foster mother provides loving and nurturing care for him. L.D. was doing well in her care, and he had a close and loving bond with his foster mother. The foster mother was willing to adopt L.D. if mother's rights were terminated.

Based on these and numerous other findings, the court concluded that mother had stagnated in her ability to parent. Mother maintained that she had made substantial progress, indicating that she had found housing and participated in a parenting assessment. With her recent marriage to Mr. Thurston, mother noted that she met the chief recommendation of a parenting assessment, namely that she have a 24 hour live-in care provider. The court found that Mr. Thurston provided good, kind and competent assistance for mother in meeting the challenges of daily living, but reiterated that he had no training or experience in meeting the care needs of a young child. Moreover, the court found that mother's abilities to meet L.D.'s needs remained in serious question despite a year and a half of in-home Easter Seals services. While mother could feed, change, and rock a doll, her treatment providers consistently and clearly testified that mother could not focus on L.D. during the one-and-a-half hour visits. She became distracted in unrelated conversation despite prompting. When L.D. was an infant, mother left him unattended on the changing table more than once. Now that he was a toddler, L.D. would play on the floor with toys while mother recounted various chapters of her life to the worker. The court found that an active toddler required constant attention, and mother's inability to focus on the child even during a short visit raised significant safety concerns for the child.

Mother's mental health presented an even more significant concern, and the court found this to be the area where existence of stagnation was most pronounced. Mother was appointed a guardian ad litem at the outset of this case. She requested a competency evaluation, which was conducted by Dr. Paul Cotton, a licensed psychiatrist. Dr. Cotton concluded that mother exhibited a delusional thought process. The court found mother not competent, and a guardian ad litem continued to represent mother's interests. By the time of the final hearing, Mother had not completed a court-ordered psychological evaluation. In the absence of that evaluation, debate about her condition and treatment needs continued. Mother's strange beliefs negatively impacted her parenting ability. During visits, she was often preoccupied with reporting grandiose skills from her past. Her insistence about being blind and deaf was belied by the testimony of numerous witnesses who on numerous occasions saw her display the capacity to see and hear. No expert medical testimony about the nature of mother's diagnosis was presented.

Whether mother truly had factitious disorder or some other diagnosis remained to be established. But to the extent that the court was still faced with such questions a year and a half into the case plan, it was clear that progress on this aspect of the case plan had stalled completely.

Turning to the statutory best-interest factors, the court found that mother and L.D. did not have a close loving bond. Mother had provided little direct care and she had missed significant amounts of visitation. L.D. had a close and loving relationship with his foster mother, and he was thriving in her care. The court also concluded that mother could not parent within a reasonable period of time as measured from L.D.'s perspective. While mother had made some progress, the bigger challenges of parenting a child remained a struggle. She had not shown that she could focus on L.D. for any significant length of time. Most importantly, mother had not cooperated with efforts to shed light on her mental health needs and treatment. She continued to make bizarre pronouncements and engage in odd behaviors. She resisted advice from service providers. The court explained that L.D. was almost two years old, and he was showing signs of emotional strain as efforts at reestablishing visitation continued. Finally, the court found that mother had largely played a neutral role in L.D.'s life. She had not, however, demonstrated a consistent interest in L.D. She missed many visits and failed to play any sustained or significant role in L.D.'s care. Based on its analysis, the court concluded that termination of mother's rights was in L.D.'s best interests. This appeal followed.

Mother argues that the court erred in presuming that her new husband could not parent L.D. According to mother, all adults presumably know how to parent a child, and thus, the court's finding that mother's new husband would not be an able caregiver for L.D. is baseless. Mother maintains that, had DCF allowed her husband to see the child, he could have demonstrated his parenting skills and she could have established that she had the 24-hour live-in support that would enable her to care for L.D.

In post-disposition proceedings, the question is whether there has been a substantial change of circumstances such that termination of mother's parental rights was in L.D.'s best interests. The question is not the extent to which a surrogate can assume mother's parental duties in her stead.

The court carefully considered whether mother's ability to care for L.D. had stagnated. Although the court found mother had made some progress in her parenting abilities, mother's lack of progress on her mental health issues provided the most pronounced example of stagnation. Mother's failure to complete a mental health evaluation left debate about her condition and her treatment needs. The court's determination that there had been a substantial change in circumstances due to stagnation was amply supported.

Having found a substantial change of circumstances, the court considered four statutory factors to determine if termination of parental rights was in L.D.'s best interests. See 33 V.S.A. § 5114(a). The most important factor is the likelihood that the natural parent will be able to resume her parental duties within a reasonable period of time as measured from the perspective of the child. See In re B.M., 165 Vt. 331, 336 (1996). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.).

The court applied the appropriate standard here, and its findings and conclusions are supported by the evidence. First, as the State notes, the court did not find that mother's new

husband could not parent a young child, but instead concluded, based on husband's own testimony, that he had no training or experience in meeting the care needs of a young child.  Mr. Thurston became mother's caregiver and husband after the petition to terminate parental rights was filed, and both DCF and the court articulated reasonable grounds for denying mother's request to include Mr. Thurston in visitation.  The court's decision in no way turned on husband's ability or inability to parent, nor did it rest on factors beyond mother's control.  The court recognized that mother now had a live-in caregiver, which demonstrated that mother had made some progress.  Nonetheless, it concluded that termination of mother's rights was warranted based on: mother's lack of parenting skills despite eighteen months of in-home services; her serious unresolved mental health issues; her lack of a close and loving relationship with L.D. in contrast to the loving bond L.D. had with his foster mother; her inconsistent visitation with L.D.; her inability to parent within a reasonable period of time; and her lack of a demonstrated consistent interest in L.D.  These findings and conclusions are amply supported by the evidence, and we find no error.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Beth Robinson, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice